UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JESSICA FLEMING, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 15 C 9036 |
| v. | ) |
| | ) Judge Sara L. Ellis |
| THE CHICAGO OF PROFESSIONAL PSYCHOLOGY; MICHAEL FOGEL (in his professional capacity); DARLENE PERRY (in her professional capacity); ELLIS COPELAND (in his professional capacity); MICHELE NEALON-WOODS (in her professional capacity); DOES I–X, inclusive of the internal legal counsel for the Chicago School of Professional Psychology from 2008–2015, | ) |
| | ) |
| Defendants. | ) |

## OPINION AND ORDER

Believing Defendant The Chicago School of Professional Psychology ("TCS") left her unprepared for its masters of psychology program and then forced her out of the program, Plaintiff Jessica Fleming alleges that TCS and its faculty and administrators are liable for breach of contract and fraud. TCS moves for summary judgment.[1] Because Fleming has failed to create a genuine issue of material fact as to TCS's liability for fraud or breach of contract, the Court grants TCS's motion.

## BACKGROUND[2]

TCS is a nonprofit educational institution that operates pursuant to the policies, procedures, rules, and regulations set forth in its Academic Catalogues and Student Handbooks.

---

[1] Fleming has not served any of the other defendants.

[2] The facts in this section are derived from the Joint Statement of Undisputed Material Facts ("JSUMF") [94]. All facts are taken in the light most favorable to Fleming, the non-movant.

In the summer of 2009, Fleming was a forensic psychology student at TCS. She enrolled in Dr. Darlene Perry's "Diversity in Forensic Psychology" class (the "Diversity Class") during the summer 2009 session. On the first day of class, she introduced herself using a first name that was not hers and, when Perry asked the students what their fears were, Fleming said that "she was afraid that she was not going to learn anything." Doc. 94 ¶ 7. During the Diversity Class, Fleming participated in a group project with two other students. Those two students met with Perry without Fleming—this upset Fleming, although she did not know why they met with Perry without her. Perry did not grade the Diversity Class assignments with a letter grade, but Fleming received a "B-" grade in the class.

Also during the summer 2009 term, Fleming enrolled in Karen Smith's "Theories of Counseling and Psychotherapy" class (the "Theories Class"). According to the TCS course catalog, in the Theories Class, "[t]he key elements, concepts, and techniques associated with each theory are discussed along with how to apply each theory to diverse populations within various therapeutic and forensic settings." *Id.* ¶ 14 (quoting Doc. 61-2 at 22). Smith followed the Theories Class curriculum, taught the different theories listed on the syllabus and course description in the Theories Class, and accordingly, the students learned various theories of psychology in this class. The Theories Class introduced Fleming to "the application of these theories to a forensic setting through two theoretical case conceptualization assignments." *Id.* ¶ 17. In addition, Fleming learned what the "basic principles of forensic psychology" were and how to "theoretically conceptualize a hypothetical client through case studies." *Id.* ¶ 18. The course description did not represent that it would cover "forensic theory." Fleming received an "A" in this course.

2

Fleming enrolled in the Practicum Seminar in fall 2009. Elyse Feldmann taught this course, which consisted of a classroom portion that ran concurrently with an internship. In connection with the course, Fleming interned for the Anixter Center ("Anixter"). In the classroom portion of the Practicum Seminar, Feldmann taught students how to apply the theories they learned to forensic settings, and students practiced the actual application of those theories during the internship portion. This was the first time that students applied the theories they had learned to actual clients in a forensic setting. The classroom portion of the Practicum Seminar required students to complete case conceptualizations, and because it was their first time doing them with respect to an actual client, it was common for students to perform poorly on the first conceptualization. Fleming received low scores for her internship, and TCS placed her on an Academic Development Plan ("ADP"). Ultimately, TCS removed her from the internship and told her that she would fail the Practicum Seminar.

During the fall 2009, Fleming began dating another student in the Forensic Psychology program (the "Student"). The relationship soured, and the Student stopped responding to Fleming and blocked her on Facebook. After this, Fleming went to the Student's apartment building, arriving after midnight and staying into the afternoon the next day. After Fleming and the Student broke up, she continued to try to communicate with him. She attempted to contact him while he was working at his job at TCS. After receiving a report about Fleming's attempts to contact the Student, Dr. Michael Fogel, the Forensic Psychology Chair, interviewed both the Student and Fleming separately.

In April 2010, after TCS terminated Fleming from her Practicum Seminar that March, Fogel referred Fleming to the Student Affairs Committee ("SAC"). TCS refers students to the SAC for "issues relating to academic performance and professional comportment" and such a

referral can result in disciplinary action including dismissal from TCS. *Id.* ¶¶ 43–44. Fleming's referral detailed concerns regarding her "practicum and internship experience, as well as [her] progress in the Forensic Psychology Program and her relationship with the Student." *Id.* ¶ 46. Specifically, the referral explained that Anixter terminated her from her internship and attached a letter from Dr. Romita Sillitti that described Fleming's difficulties in both the internship and the classroom portions of the Practicum Seminar and efforts TCS took to help Fleming address those difficulties. Sillitti's letter included evaluations from Feldmann and Fleming's supervisor at her internship. The referral also described Fogel's interviews with Fleming and the Student regarding Fleming's behavior toward the Student, various emails Fleming sent to the Student (which were also attached), Fleming's visit to the Student at his TCS job, and Fleming's lengthy visit to the Student's apartment. Fleming has admitted that she sent the emails attached to the referral, contacted the Student at his job, and attempted to contact the Student during her lengthy visit to his apartment building.

The referral also attached two other memos from professors at TCS. The first, a memo written by Perry, described Fleming's performance in the Diversity Class. Perry noted issues with Fleming's performance in the class. For example, she stated that Fleming introduced herself using a different first name and last name on the first day of class—Fleming admitted that she introduced herself using a different first name that day. By all accounts, when Perry asked students on the first day what their fears were, Fleming either stated or wrote that she was afraid she would not learn anything from the course. Perry further stated that Fleming "felt she had nothing to learn from the Diversity Class, that she completed every assignment incorrectly, and that she wanted to enroll in a different Diversity class section because of a conflict with an internship schedule." *Id.* ¶ 61. The second memo, written by Dr. Perry Meyers, noted that he

4

met with Fleming every other week during the summer 2009 semester to "follow up to concerns expressed by faculty," which included concerns about Fleming's "organization skills, critical writing skills, self awareness and professional comportment." Doc. 94-7 at 46.

Fleming received a copy of the SAC referral prior to her SAC hearing. At the hearing, Fogel reviewed the materials attached to the SAC referral with the SAC members. Fleming had the right to question individuals and examine the information that Fogel presented. She told the SAC members that Perry's statements in her memo about her grades and behavior toward her peers in the Diversity Class was inaccurate. The SAC dismissed Fleming from TCS, citing her termination from the Practicum Seminar, the evaluations from Feldmann and Fleming's internship supervisor, as well as Fleming's prior "academic difficulties." Doc. 94 ¶ 74. The SAC found that Fleming had received significant assistance, and that she had made minimal progress in spite of that assistance. In response to a complaint that Fleming filed with the Illinois Board of Higher Education ("IBHE"), TCS informed the IBHE that neither Perry's assessment of Fleming's performance in the Diversity Class nor Fogel's description of Fleming's interactions with the Student constituted "major concerns" that had a "significant role" in Fleming's dismissal. *Id.* ¶ 77.

Fleming appealed the SAC's decision to dismiss her, and Dr. Ellis Copeland of TCS denied her appeal in June 2010. Fleming also sought a hearing under the Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g ("FERPA"), in which she sought to remove Perry's memo and any references to her relationship with the Student from her academic file. Copeland appeared at the hearing and told Fleming that he spoke to Perry before he rejected Fleming's appeal of the SAC decision. Perry informed him that her memo was true and showed him her grade book from the Diversity Class, which showed that Fleming "was failing the whole time

5

pretty much[.]" *Id.* ¶ 82. Fleming has no evidence that Perry's representations influenced Copeland when he rejected her appeal. Because of the FERPA hearing, TCS removed Perry's memo from Fleming's academic file because a line in the memo stated that Fleming "had completed every class assignment incorrectly." *Id.* ¶ 85.

Fleming was the only student in her Practicum Seminar section terminated from her internship, referred to the SAC, and dismissed from TCS. She was also the only Forensic Psychology program student that the SAC dismissed that academic year. Some of the students in the same program at the same time as Fleming passed the National Counselor Examination ("NCE"), which is an examination that many states require individuals to pass in order to become licensed as a counselor. Fleming reapplied to the TCS Forensic Psychology program in 2012. She stated in her reapplication letter that, while she was a student at TCS, she "learned about different aspects of forensic psychology that [she] still use[s] today." *Id.* ¶ 87.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. To determine whether a genuine issue of fact exists, the Court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed. R. Civ. P. 56 & advisory committee's notes. The party seeking summary judgment bears the initial burden of proving that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In response, the non-moving party cannot rest on mere pleadings alone but must use the evidentiary tools listed above to identify specific material facts that demonstrate a genuine issue for trial. *Id.* at 324; *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). Although a

bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the Court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

## ANALYSIS

### I. Breach of Contract Claim

TCS argues that Fleming's breach of contract claim is an educational malpractice claim masquerading as a breach of contract claim and that Fleming has not provided any facts that would support a breach of contract claim.

In Illinois, the legal relationship between a student and school is contractual, with the terms of the contract "generally set forth in the school's catalogs and manuals." *Diperna v. Chicago Sch. of Prof'l Psychology*, No. 14-CV-57, 2015 WL 361902, at *2 (N.D. Ill. Jan. 27, 2015) (quoting *Holert v. Univ. of Chicago*, 751 F. Supp. 1294, 1300 (N.D. Ill. 1990)). "To state a claim for breach of contract, the plaintiff must do more than simply allege that the education was not good enough. Instead, [she] must point to an identifiable contractual promise that the defendant failed to honor." *Ross v. Creighton Univ.*, 957 F.2d 410, 416–17 (7th Cir. 1992). "[I]f a claim raises questions about the reasonableness of an educator's conduct in providing education services, or if a claim requires an analysis of the quality of education, then it is a noncognizable claim for educational malpractice." *Waugh v. Morgan Stanley and Co.*, 2012 IL App (1st) 102653, ¶ 47, 966 N.E.2d 540, 359 Ill. Dec. 219 (2012). To succeed on a breach of contract claim in this context, "the essence of the plaintiff's complaint" must be "not that the institution failed to perform adequately a promised educational service, but rather that it failed to perform that service at all." *Ross*, 957 F.2d at 417. "Ruling on this issue would not require an

7

inquiry into the nuances of educations processes and theories, but rather an objective assessment of whether the institution made a good faith effort to perform on its promise." *Id.*

The only breach of contract claim that this Court allowed to move forward in its opinion on TCS's motion to dismiss is Fleming's claim that TCS had failed to teach Fleming psychology theory. *See* Doc. 78 at 7. To survive summary judgment on this type of breach of contract claim, Fleming would need to provide sufficient evidence to create a genuine material fact regarding: (1) TCS's promise that it would teach her psychology theory, and (2) TCS's failure to teach that topic at all. With regard to the first issue, the only specific contractual promise that Fleming identifies is a statement in the course catalog was that the Theories Class would examine "the major theories of counseling and psychotherapy, including (but not limited to) cognitive/behavioral therapy, humanistic/existential therapy, and psychodynamic therapy." Doc. 61-2 at 22. Further, the course would discuss "[t]he key elements, concepts, and techniques associated with each theory . . . along with how to apply each theory to diverse populations within various therapeutic and forensic settings." *Id.* But review of the facts that the parties submitted in the JSUMF shows that TCS fulfilled that promise. Smith, the professor, "taught the different theories listed on the syllabus and course description in the Theories Class." Doc. 94 ¶ 15. "The students learned various theories of psychology in the Theories Class." *Id.* ¶ 16. The Theories Class introduced Fleming "to the application of these theories to a forensic setting through two theoretical case conceptualization assignments in the Theories Class." *Id.* ¶ 17. Moreover, Fleming "learned to theoretically conceptualize a hypothetical client through case studies in her Theories class and the basic principles of forensic psychology." *Id.* ¶ 18.

In her response, Fleming emphasizes that her claim centers on not only TCS's teaching her forensic psychology, but also on teaching her the application of that theory to clients. But

the JSUMF itself states that she learned the application of that theory, *id.* ¶ 17, and even if the JSUMF did not provide that information, Fleming would need to provide some sort of factual basis on which a factfinder could rely in finding that Smith did not teach the Theories Class how to apply the theories it learned. Fleming does not point to any facts that support this claim.

According to Fleming, the basis of her breach of contract claim is that TCS did not teach "application of basic theory to clients . . . in the manner by which students were expected to perform it during internship," TCS did not teach forensic psychology "at all," and her internship disadvantaged her because it was not forensic. Doc. 96-1 at 5. First, the Court has already dismissed Fleming's breach of contract claim regarding the internship TCS allowed her to enter for her Practicum Seminar. *See* Doc. 78 at 7. Moreover, even setting aside the issue of whether TCS promised her these things, she has provided no evidence to support these claims. Her citations to the JSUMF in fact show the opposite, that TCS did teach her various psychology theories and application of those theories to a forensic setting, and her citations to TCS's memorandum in support of its motion for summary judgment argues the opposite. A reasonable factfinder would have no basis on which to find that TCS did not teach forensic theory or the application of basic theories to clients. At this stage in the case, this fact is fatal to Fleming's claim, and so the Court grants TCS's motion for summary judgment on this issue.

## II.     Fraud Claims

TCS also seeks summary judgment on Fleming's remaining fraud claims. The remaining claims center on statements in (1) Perry's memo to Fogel regarding Fleming's performance in the Diversity Class, (2) Perry's statement to Copeland regarding the same topic, made while Copeland was considering Fleming's appeal of the SAC decision, and (3) Fogel's representations

in the SAC referral and at the SAC hearing.³ Under Illinois law, "[t]he elements of common law fraud are: (1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damages resulting from reliance on the statement." *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 591, 174 Ill.2d 482, 221 Ill. Dec. 389 (1996). TCS argues that it is entitled to summary judgment on these claims because Fleming cannot establish that TCS intended for any of the statements to induce her to act or that Fleming relied on any of the communications.⁴ The Court agrees.

Fleming cannot establish that TCS intended to induce her to act on Perry and Fogel's statements because she herself admits that the statements were not directed at her or made with the intent to influence her. Perry's statement in her memo was meant to induce Fogel and the SAC to act, Fogel's statements were meant to induce the SAC to act, and Perry's statement to Copeland was meant to induce Copeland to act; none of this goes to whether Perry and Fogel intended to induce Fleming herself to act. *See Swanson v. Citi*, No. 09 C 2344, 2009 WL 5183801, at *4 (N.D. Ill. Dec. 22, 2009) (dismissing fraud claim against defendants who allegedly created a false appraisal of plaintiffs' house because the statements were not intended to cause plaintiffs to act). Fleming does not even identify what act TCS would have intended her to commit. Her response focuses on the fact that she had to respond to Perry's memo and

---

³ In her response, Fleming also raises a claim regarding Copeland's statements to Fleming "regarding new evidence he was investigating that instructed her not to take action until he was finished investigating." Doc. 96-1 at 9. However, Fleming does not detail a fraud claim against Copeland in her complaint, and despite full briefing on the fraud claims for TCS's motion to dismiss, neither side mentioned this fraud claim regarding statements made by Copeland. As such, the Court will not consider this claim.

⁴ TCS also argues that some of the statements upon which Fleming bases her claims are in fact true, that some of the statements are immaterial, and that Fleming suffered no damages as a result of these fraud claims. Because the Court finds that Fleming has not presented sufficient evidence of TCS's intent to induce her to act or her reliance on the statements, it will not address these arguments.

Fogel's representation at the SAC hearing, but this is not sufficient to show that TCS intended to induce her to act. Merely being aware of, or responding to, allegedly false statements is not enough. To succeed on this element, Fleming must show that TCS intended for her to believe the false statement and then perform some action because of her belief in the false statement. Even by Fleming's account, the opposite happened—she contested the statements at every opportunity. *See* Doc. 96-1 at 13 (noting that "[Fleming] informed the SAC that she thought the Perry Memo and Fogel Statements were inaccurate" and submitted documents to Copeland "seeking to refute statements in the Perry Memo"). No evidence indicates that TCS intended for her to rely on those statements.

Even if Fleming could establish that TCS intended to induce her to act, she cannot establish that she actually relied on Perry or Fogel's statements. If a plaintiff knows that the statements made to her are false, she cannot establish that she relied upon them. *See Smith v. Am. Gen. Life & Accident Co.*, No. 99 C 3743, 2002 WL 215527, at *5 (N.D. Ill. Feb. 11, 2002) (finding that, "[b]ecause this evidence demonstrates plaintiff's knowledge of the 'falsity' of these representations, there can be no reliance on the truth of them"). Again, by her own admission, Fleming did not believe that any of the allegedly false statements were true. This is clear from her actions as she describes them; she consistently contested the statements in her representations to the SAC at the hearing, her submissions to Copeland during her appeal, and her demand for a FERPA hearing seeking to remove the statements from her academic record. Doc. 96-1 at 13. Fleming attempts to distinguish *Smith* and the other cases TCS cites on this issue, arguing that, unlike those cases, she was not certain that the allegedly false statements were not true at the time they were made. *Id.* at 14 (Fleming "only thought the statements weren't completely accurate and did not truly know the statements made by Dr. Perry to the SAC were not true until

11

she discovered evidence to the contrary."). The problem with this argument is that the burden is on Fleming to show that she did in fact believe the false statements to be true—she does not even attempt to argue this, let alone provide evidence of this.

Additionally, in her response, Fleming argues that TCS "has no evidence to show how, if, or how much Plaintiff relied upon any of the communications she was exposed to." *Id.* at 12. This misunderstands the burdens here: TCS merely needs to show that Fleming has not submitted evidence to create a genuine issue of material fact as to her claims. As the plaintiff, Fleming is the party who must provide sufficient evidence that a reasonable factfinder could find in her favor. *Celotex*, 477 U.S. at 324. She has not done so with regard to intent to induce or reliance, and so the Court grants summary judgment in favor of TCS on Fleming's fraud claims.

## III.    Unserved Defendants

The Court notes that, although this case has been filed for over three years, Fleming has yet to serve the defendants in this case other than TCS. Federal Rule of Civil Procedure provides that:

> If a defendant is not served within 90 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period.

Fed. R. Civ. P. 4(m). However, "[i]f the delay [in obtaining service] has been so long that it signifies failure to prosecute—or if the delay entails disobedience to an order of the court—then dismissal may be with prejudice under Rule 41(b), which covers 'failure of the plaintiff to prosecute or to comply with these rules or any order of the court.'" *O'Rourke Bros. Inc. v. Nesbitt Burns, Inc.*, 201 F.3d 948, 953 (7th Cir. 2000) (quoting *Powell v. Starwalt*, 866 F.2d 964, 966 (7th Cir. 1989)). "[A] court has the discretion to dismiss for want of prosecution if the

plaintiff's delay in obtaining service is so long that it signifies failure to prosecute." *Williams v. Ill.*, 737 F.3d 473, 476 (7th Cir. 2013) (affirming court's decision to dismiss case with prejudice where plaintiff had not served defendants for more than 16 months after filing suit). Fleming's case has been pending for three years, and the Court put Fleming on notice of her failure to serve those defendants in its minute order on October 19, 2017. Doc. 80 ("Plaintiff has failed to properly serve the individual Defendants."). More than a year later, Fleming still has not served these defendants. In light of this, the Court finds that Fleming has failed to prosecute the unserved defendants and dismisses her claims against them with prejudice.

## CONCLUSION

For the foregoing reasons, the Court grants TCS's motion for summary judgment [92]. The Court enters judgment for TCS on Fleming's complaint. Additionally, the Court dismisses the complaint against the unserved defendants with prejudice. This case is terminated.

Dated: January 16, 2019

SARA L. ELLIS
United States District Judge